[L. A. No. 24818. In Bank. Oct. 24, 1958.]

GENERAL DYNAMICS CORPORATION (a Corporation), Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Appellants; UNITED STATES OF AMERICA, Intervener and Respondent.

[L. A. No. 24819. In Bank. Oct. 24, 1958.]

AEROJET-GENERAL CORPORATION (a Corporation), Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Appellants; UNITED STATES OF AMERICA, Intervener and Respondent.

Harold W. Kennedy, County Counsel, Gordon Boller, Assistant County Counsel, Alfred Charles DeFlon, Deputy County Counsel, William R. MacDougall, James Don Keller, District Attorney and County Counsel (San Diego), Carroll H. Smith, Deputy, Ray T. Sullivan, Jr., County Counsel (Riverside), Albert E. Weller, County Counsel (San Bernardino), J. Frank Coakley, District Attorney (Alameda), Francis W. Collins, District Attorney (Contra Costa), Keith C. Sorenson, District Attorney (San Mateo), Spencer M. Williams, County Counsel (Santa Clara), Roy A. Gustafson, District Attorney (Ventura), John B. Heinrich, County Counsel (Sacramento), Roy J. Gargano, County Counsel (Kern), Robert M. Walsh, County Counsel (Fresno), Frederick N. Reyland, Jr., County Counsel (Stanislaus), Auten F. Bush, City Attorney (El Segundo), Frank L. Perry, City Attorney (Redondo Beach), Ferdinand P. Palla, City Attorney (San Jose), J. F. DuPaul, City Attorney (San Diego), Manuel L. Cugler, City Attorney (Chula Vista), and Arlo E. Rickett, City Attorney (Pomona), for Appellants.

Edmund G. Brown, Attorney General, James E. Sabine, Assistant Attorney General, Ernest P. Goodman, Deputy Attorney General, Dixwell L. Pierce and Robert G. Hamlin as Amici Curiae on behalf of Appellants.

Robert B. Watts, John Conway McDevitt, Gray, Cary, Ames & Frye, John M. Cranston, Ward W. Waddell, Jr., William J. Donahue, Hill, Farrer & Burrill, Carl A. Stutsman, Jr., Mark E. True and Vincent C. Page for Plaintiffs and Respondents.

Charles K. Rice, Assistant Attorney General (United States), Joseph F. Goetten, A. F. Prescott and H. Eugene Heine, Jr., Attorneys, Department of Justice, Laughlin E. Waters, United States Attorney, and Edward R. McHale, Assistant United States Attorney for Intervener and Respondent.

TRAYNOR, J.—Plaintiffs, General Dynamics Corporation and Aerojet-General Corporation, brought these actions to recover county and city ad valorem personal property taxes

for the fiscal year 1953-1954. They assert that they had no taxable interest in the property. The United States intervened and alleged that the property assessed belonged to it and that it was obligated by contract to reimburse plaintiffs for the taxes paid. The trial court entered judgments for plaintiffs and intervener, and defendants appeal.

On the first Monday in March, 1953, plaintiffs were performing various research and production contracts relating to national defense. Some were prime contracts with the armed services, and others were subcontracts. Some were fixed-price contracts, and others were cost-plus-a-fixed-fee contracts. Aerojet operated its own plant, and General Dynamics operated a plant owned by the United States Navy. The tax on General Dynamics' possessory interest in this real property is not in issue here.

Under the terms of the contracts, title to all of the personal property involved was in the United States on tax day. It comprised tools and equipment used in producing goods or carrying out research for the armed forces, materials being fabricated into products to be delivered to the armed forces, and property held on a standby basis for use in the event of increased defense research or production.

Defendants contend that plaintiffs had taxable possessory interests in this government-owned personal property. They now concede, however, that the method of evaluation adopted by the assessor was erroneous and therefore seek a reversal of the judgment with appropriate directions for correctly evaluating and taxing plaintiffs' interests.

■ It is now settled that a private contractor's right to use government property may be made the subject of a nondiscriminatory tax measured by the value of the property used even though the economic burden of the tax falls on the United States. (*City of Detroit* v. *Murray Corp. of America,* 355 U.S. 489 [78 S.Ct. 458, 486, 2 L.Ed.2d 441, 460]; *United States* v. *City of Detroit,* 355 U.S. 466 [78 S.Ct. 474, 2 L.Ed. 2d 424]; *United States* v. *Township of Muskegon,* 355 U.S. 484 [78 S.Ct. 483, 2 L.Ed.2d 436].) ■ A fortiori, a state may stop short of imposing such a tax and impose a tax on a privately held possessory interest in tax exempt property measured by the value of that interest. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879].) The first question in these cases is whether the state has done so.

Defendants contend that there is no logical distinction between possessory interests in real and personal property. They

point out that possessory interests in real property are taxable (*De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546 [290 P.2d 544]; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879]; Rev. & Tax. Code, § 104) and invoke section 1 of article XIII of the California Constitution and Revenue and Taxation Code, section 201, as establishing the same rule with respect to personal property.

Section 1 of article XIII provides that "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided. The word 'property,' as used in this article and section, is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership. . . ." Section 201 provides that "All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation under this code." With respect to personal property, however, these general provisions are controlled by other constitutional and statutory provisions dealing expressly with the taxation of personal property and interests therein.

Section 14 of article XIII provides in part that "The Legislature shall have the power to provide for the assessment, levy and collection of taxes upon all forms of tangible personal property, all notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust, mortgages, and any legal or equitable interest therein, not exempt from taxation under the provisions of this Constitution, in such manner, and at such rates, as may be provided by law, and in pursuance of the exercise of such power the Legislature, two-thirds of all of the members elected to each of the two houses voting in favor thereof, may classify any and all kinds of personal property for the purposes of assessment and taxation in a manner and at a rate or rates in proportion to value different from any other property in this State subject to taxation and may exempt entirely from taxation any or all forms, types or classes of personal property."

Under these provisions the Legislature may provide for the taxation of "all forms of tangible personal property" and "any legal or equitable interest therein." We have concluded, however, that the Legislature has not provided for the taxation of limited interests in tangible personal property. It has not defined personal property as including a right to

its possession as it has real property (see Rev. & Tax. Code, §§ 104, 107), and this omission reflects not merely a lack of detail, but a consistent pattern of taxing tangible personal property as an entity or not at all.

■ Although taxable property may be assessed to a mere possessor (Rev. & Tax. Code, § 405; *S. & G. Gump Co.* v. *City & County of San Francisco,* 18 Cal.2d 129, 131 [114 P.2d 346, 135 A.L.R. 595]) and such a possessor is required to file a statement of his possession (Rev. & Tax. Code, § 442), the property is assessed at "its full cash value" (Rev. & Tax. Code, § 401) and is listed on the assessment roll as personal property and not as a possessory interest therein.* No provision is made for declaring or assessing a possessory interest in tax exempt personal property. ■ Moreover, section 612 provides that when "a person is assessed as agent, trustee, *bailee,* guardian, executor, or administrator, his representative designation shall be added to his name, and the assessment entered separately from his individual assessment." (Italics added.) The assessee is liable for taxes assessed against him under this section only in his representative capacity. (*County of Los Angeles* v. *Morrison,* 15 Cal.2d 368, 371-373 [101 P.2d 470, 129 A.L.R. 443].) ■ Accordingly, if the property held in such capacity is tax exempt, any assessment of it would necessarily be self-defeating for the tax could not be enforced against the property or its possessor personally, at least in cases such as these, where the bailee's interest in the property could not be transferred.

■ It is true that from an economic viewpoint a bailee's right to use tax exempt personal property may be as valuable as the right to use tax exempt real property. In construing ad valorem tax legislation, however, we cannot overlook the historical distinction between real and personal property that is reflected not only in the statutory provisions but in common

---

*Revenue and Taxation Code, section 602, provides that the "local roll shall show:

"(a) The name and address, if known of the assessee.

"(b) Land, by legal description.

"(c) A description of possessory interests sufficient to identify them. [Section 107 confines such interests to interests in real property.]

"(d) Personal property. . . .

"(e) The cash value of real estate, except improvements.

"(f) The cash value of improvements on the real estate.

. . . . . . . . . . . .

"(h) The cash value of possessory interests.

"(i) The cash value of personal property, other than intangibles. . . . . . . . . . . ."

understanding of what sort of interest in property is necessary to qualify as property itself within the meaning of tax statutes. The distinction was recognized in *Kaiser Co.* v. *Reid,* 30 Cal.2d 610 [184 P.2d 879], and it was held in both *Douglas Aircraft Co.* v. *Byram,* 57 Cal.App.2d 311 [134 P.2d 15], and *C. C. Moore & Co., Engineers* v. *Quinn,* 149 Cal.App.2d 666 [308 P.2d 781], that possessory interests in tangible personal property were not taxable property. *Timm Aircraft Corp.* v. *Byram,* 34 Cal.2d 632 [213 P.2d 715], is not to the contrary for in that case the court concluded that the taxpayer was in fact the owner of the funds involved. The Timm case is consistent with the theory that it is the property rather than interests therein that is the subject of the tax, for the tax was sustained on the ground that the property was owned by the taxpayer, not the United States.

The right to obtain an economic benefit from the use or possession of property may be a relevant consideration in determining who is actually its owner for tax purposes in doubtful cases (*Timm Aircraft Corp.* v. *Byram,* 34 Cal.2d 632, 638 [213 P.2d 715] ; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 621 [184 P.2d 879]), but the existence of such right is not controlling. No one would contend that a warehouseman was the owner of government property stored with him, or that a repair shop proprietor was the owner of government automobiles brought to him for repairs, even though their possessory interests in such government property were profitable to them. In accord with such common understanding, the assessor himself in the present cases did not assess to plaintiffs government property supplied to them by the government to enable them to perform their contracts.

Defendants now contend, however, that it is immaterial who has title so long as the essential economics of the transaction remain the same. What difference, they ask, should it make that in one case the government may supply tools and material already owned by it, whereas in another it requires the contractor to acquire tools and material that immediately become government property, and in still another title remains in the contractor until the goods are delivered and the tools disposed of, if in all three cases the contractor receives essentially the same compensation for performing essentially the same services? Although there may be no difference of practical significance if the contract is carried out as planned, there may be a vital difference in the event of breach or termination. (See *United States* v. *Ansonia Brass*

*& Copper Co.*, 218 U.S. 452, 471 [31 S.Ct. 49, 54 L.Ed. 1107]; *In re Read-York, Inc.*, 152 F.2d 313, 316.) In one case the government as owner has the right to do with the property as it pleases subject only to such limitations as the contract imposes; in the other it is the taxpayer who has such right subject only to such limitations. However irrelevant such considerations might be to the application of a tax on the use or possession of property, they are not irrelevant to the application of an ad valorem tax on the property itself.

Although in any given case the impact of a use tax and a property tax might appear identical, they are not the same thing, and we cannot sustain a property tax here on the ground that the Legislature could constitutionally provide for the levy of a tax of equal amount under a different scheme. To be valid a use or possession tax would have to apply to all tax exempt property so as not to discriminate against the private use or possession of property owned by the United States, and it is for the Legislature, not the court, to determine whether such a nondiscriminatory tax on possessory interests in tax exempt personal property should be adopted and to determine the measure of such a tax.

The question remains whether plaintiffs retained such an interest in any or all of the property so that they were in fact the owners for tax purposes despite the clauses in the various contracts vesting title in the United States. A title clause standing alone is not conclusive of ownership for tax purposes when it appears that the taxpayer retains the essential indicia of ownership (*American Motors Corp.* v. *City of Kenosha*, 274 Wis. 315 [80 N.W.2d 363, 367], aff'd 356 U.S. 21 [78 S.Ct. 559, 2 L.Ed. 2d 578]; *C. C. Moore & Co., Engineers* v. *Quinn*, 149 Cal.App.2d 666, 670 [308 P.2d 781]) or that the government title is for security only. (*Timm Aircraft Corp.* v. *Byram*, 34 Cal.2d 632, 638 [213 P.2d 715], and cases cited.) Accordingly, it is necessary to examine the terms of the contracts to determine whether plaintiffs retained rights in the property inconsistent with its ownership by the United States for tax purposes.

The title clause of a typical cost-plus-fixed-fee contract provides that title to personal property acquired by the contractor passed to the government "(1) in the case of such property which is purchased by the contractor for the performance of this contract, upon delivery to the contractor at the contractor's plant or at the plant of the supplier on f.o.b.

purchases if the Naval Inspector at the contractor's plant shall have given his approval or (2) in the case of property not so purchased, upon the allocation thereof to the contract by the commencement by the contractor of processing or use thereof or otherwise. Such passage and vesting of title shall not impair any right which the Government might otherwise have under this contract, including but not limited to the right to reject any supplies hereunder, and shall not relieve the contractor of any of its obligations under this contract." After title passed, such property was treated in essentially the same manner as government property supplied to the contractor directly by the government for use in carrying out the contract. It was to be used "by the contractor for the performance of this contract or of other contracts with" the government, and with certain limitations the risk of loss was borne by the government. The contractor retained no beneficial interest other than the right of use in carrying out its contract. Scrap or other property no longer needed was sold under close government supervision and the proceeds applied to the reduction of payments owing to the contractor from the government. If the contract was completed or terminated in whole or in part, property not already delivered to the government was either disposed of as the government directed for the government's sole benefit or made available for further use in performing other contracts. The government could and did remove its property at any time it saw fit, and even if such removal constituted a violation of the contractor's right to use the property, it does not appear that the contractor could prevent it or pursue other than purely contract remedies for the breach. Throughout plaintiffs' operations under the contracts the government exercised control fully consistent with its ownership of the property involved, and the trial court found on the basis of substantial evidence that its use was "under the close, direct and watchful immediate supervision and control of the representatives of the United States." Accordingly, in the case of property supplied by the government and property to which it took title under the cost-plus-fixed-fee contracts, plaintiffs neither secured nor retained the essential indicia of ownership and were therefore not the owners of such property for tax purposes.

The foregoing discussion with respect to government supplied property under cost-plus-fixed-fee contracts also applies to government property supplied under separate agreements for use by the plaintiffs generally in performing their con-

tracts and to government property supplied for performing fixed-price contracts.

Contractor-acquired property under fixed-price contracts, however, is treated in some respects differently, and requires separate discussion. Only plaintiff Aerojet had fixed-price contracts. A typical title clause provided:

"(1) Upon the payment of any progress payment to the Contractor under this contract, legal and equitable title to all materials, assemblies, subassemblies, parts, inventories, work in process, non-durable tools, completed work and other property acquired, produced or allocated by the Contractor for the performance of this contract shall vest absolutely in the Government forthwith upon acquisition, production or allocation by the Contractor of such property for such performance. Such passage and vesting of title shall not relieve the Contractor or the Government of any of their respective rights or obligations under this contract, nor shall it affect the responsibility of the Contractor in the event of loss or destruction of or damage to property.

"(2) Property, title to which is or hereafter may become vested in the Government under the provisions of this Section may be (i) incorporated in supplies to be furnished hereunder, (ii) disposed of by the Contractor as obsolete, worn out, or damaged, (iii) altered from time to time, (iv) expended in the production of such supplies. To the extent any such property is not incorporated in supplies delivered hereunder, or disposed of as obsolete, worn out or damaged, or expended in the production of such supplies, title to such property shall pass to and vest in the Contractor when such property is no longer necessary or useful for the performance of this contract, subject, in the case of termination, to the provisions of the Sections hereof entitled, 'Termination for Convenience of the Government' and 'Default.'"

Under the termination and default clauses the government could retain title and assume possession or otherwise direct the disposition of the property.

 Under normal operations the distinction between the treatment of contractor-acquired property under fixed-price contracts and fixed-fee contracts was that in the former case the contractor had the right to dispose of or receive title to property no longer useful or necessary in the performance of the contract whereas in the latter case the government retained such rights; in the former the risk of loss was borne by the contractor, and in the latter, by the government. These dis-

tinctions, however, are not inconsistent with the government's ownership of the property for tax purposes during the crucial period when title was vested in it. Placing the risk of loss on the contractor benefits the government, not the contractor, and is not by itself inconsistent with government ownership. (*United States* v. *Ansonia Brass & C. Co.*, 218 U.S. 452, 466-467 [31 S.Ct. 49, 54 L.Ed. 1107].) While the property was still useful or necessary for the performance of the contract it could only be used in performance of the contract unless the government otherwise directed, and in practice the government exercised the same supervision and control over the disposal of scrap material under fixed-price contracts as it did under fixed-fee contracts.

In some respects the problem is the converse of that presented in *Timm Aircraft Corp.* v. *Byram,* 34 Cal.2d 632 [213 P.2d 715]. In that case title to advance payments made to the contractor by the government was held to be in the contractor for tax purposes despite the government's right to reclaim those funds not necessary for the contract's performance and the balance of the funds in the event of the contract's termination. Conversely, in the present case, the parties have provided for the passage of title to materials before the delivery of the finished products, and there is a provision revesting title to unnecessary materials in the contractor. Just as in the Timm case, where the contractor received substantial interests in the advance payments before they were fully earned, so in this case the government received substantial interests in the property on making a progress payment, interests it would not have received in the absence of the title clause. It did not have solely a lien or security interest that could be defeated by the discharge of the obligation secured or whose enforcement might entail a sale terminating its interest in the property. To serve its best interests, the government could terminate the contracts in whole or in part and take possession of its property, and it could do likewise in the event of the contractor's default, whether or not such default constituted a breach of contract. In any such event, it was not dependent on the performance of the contractor's obligations to it to protect its rights, for the property was already its.

In *American Motors Corp.* v. *City of Kenosha,* 274 Wis. 315 [80 N.W.2d 363, 366-367], invoked by defendants, the court interpreted a fixed-price contract similar to the ones involved here and stated that ''the Company's right to acquire [for

itself] or dispose of the property [title to which had passed to the government] is subject to no restriction, the only requirement being that a price for such acquisition be agreed upon with the Contracting Officer and the amount involved be paid or credited to the Government as the Officer may direct.'' It concluded that ''the unrestricted right of the Company under the contract to acquire and dispose of the property and the risk of loss are elements of ownership inconsistent with the vesting of title in the Government as would render the property immune from taxation.'' The decision in the American Motors case, however, appears to have overlooked the fact that the contractor's right to acquire or dispose of the property other than scrap could only be exercised at the option of the government. Until such option was exercised in favor of the contractor, it, like Aerojet, had no right to acquire or dispose of government property. Moreover, as pointed out above, the mere fact that the risk of loss was borne by the contractor is not inconsistent with government ownership.

We conclude that plaintiffs were not the owners of any of the property here involved for the purposes of ad valorem personal property taxation under present California statutes.

The judgments are affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Spence, J., concurred.

McCOMB, J.—I concur in the affirmance of the judgments for the reasons expressed by Mr. Justice Traynor in the majority opinion and also for the reason that the property here involved upon which defendants had attempted to levy and collect taxes was not the property of plaintiffs.

Article XIII of the state Constitution authorizes the taxation of ''property.'' The term ''property'' in the broadest meaning is ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from interfering with it. (*Black, Law Dictionary* (4th ed. 1951), p. 1382.)

In *Douglas Aircraft Co.* v. *Byram,* 57 Cal.App.2d 311, 317 [134 P.2d 15], Mr. Justice Bishop says, ''A common characteristic of a property right, is that it may be disposed of, transferred to another.''

In *Yuba River Power Co.* v. *Nevada Irr. Dist.,* 207 Cal. 521, 524 [279 P. 128], the definition of property is given as ''the

exclusive right of possession, enjoying, and disposing of a thing; it is 'the right and interest which a man has in lands and chattels, to the exclusion of others'; and the term is sufficiently comprehensive to include every species of estate, real or personal.''

In view of the foregoing definitions, the property involved in the instant cases was not property of plaintiffs since it did not have the attributes as defined above.

Plaintiffs could not use any part of the property without the consent of the government. Neither did plaintiffs have the ownership, that is, the unrestricted right to possess it, to use it, or to exclude everyone else from interfering with it. Plaintiffs did not have the power to dispose of it, to transfer it, to pledge or to hypothecate it. The property, so far as plaintiffs were concerned, had no exchangeable value and did not go to make up part of plaintiffs' estate. Therefore, since the property in question was not the property of plaintiffs, it was not properly taxable by defendants.

Schauer, J., concurred.

Appellants' petition for a rehearing was denied November 19, 1958.